UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ARANTZA ESPINOZA,                                   CASE NO.

      Plaintiff,

vs.

GOOD AMERICAN, LLC.,
a Foreign limited liability company,

      Defendant.
_____/

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND JURY TRIAL DEMAND

Plaintiff, ARANTZA ESPINOZA, through undersigned counsel, sues Defendant, Good American, LLC, a Foreign limited liability company (hereinafter referred to as "Good American"), for declaratory and injunctive relief, and damages, and alleges as follows:

1) This action is brought under Title III of the Americans With Disabilities Act ("ADA"), that is codified in 42 U.S.C. §§12181-12189.

2) This action is also brought pursuant to 28 C.F.R. Part 36.

3) This Court has jurisdiction over this case based on federal question jurisdiction, as provided in 28 U.S.C. §1331 and the provisions of the ADA.

4) Furthermore, because this Court has jurisdiction over the ADA claim, the Court has supplementary jurisdiction over Plaintiff's common law tort claim pursuant to 28 U.S.C. §1367.

5) Plaintiff is sui juris, and she is disabled as defined by the ADA and ADA Amendments Act of 2008, 42 U.S.C. §12101 ("ADAAA").

6) Defendant, Good American is a foreign limited liability company authorized to do business and doing business in the State of Florida.

7) Defendant, Good American is company that sells women's jeans, skirts, shirts, jackets, bodysuits, activewear, and dresses. There is a retail location in Miami-Dade County.

8) Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9) Plaintiff desires to prevent discrimination and demands equal access to Defendant's internet website to purchase clothing.

10) Plaintiff also seeks declaratory and injunctive relief for trespass against the Plaintiff's computer. The computer is Plaintiff's personal property, and a claim for trespass attached to same.

11) The Defendant is also liable for compensatory damages to Plaintiff as a result of the trespass to Plaintiff's personal property.

12) The remedies provided under common law for trespass are not exclusive, and same may be sought in connection with suits brought under the ADA.

13) Venue is proper in the Southern District of Florida, Miami-Dade Division, since all events, actions, injuries, and damages complained of herein occurred in the Southern District of Florida.

14) Furthermore, Plaintiff is a resident of Miami-Dade County which falls within the Miami Division of the Southern District of Florida.

15) At all relevant times, Plaintiff is and was visually impaired and has Leber Congenital Amaurosis since birth that substantially impairs Plaintiff's vision.

16) Plaintiff's visual impairment interferes with her day-to-day activities and causes limitations in visualizing their environment. As such, Plaintiff is a member of a protected class under the ADA, 42 U.S.C. § 12102(1) - (2), the regulations implementing the ADA set forth at 28 CFR §§ 36.101, et seq., and in 42 U.S.C. 3602, §802(h).

17) Plaintiff regularly uses the computer, but she needs the assistance of special software for visually impaired persons. The software that she uses is screen reader software that is readily available commercially.

18) Defendant is a private entity which owns and operates retail locations. The stores are open to the public, and each of Defendant's locations is defined as a "public accommodation" within the meaning of Title III of the ADA because Defendant is a private entity which owns and/or operates "[A] bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment," per 42 U.S.C. §12181(7)(E) and 28 C.F.R. §36.104(2).

19) Defendant's website is a place of public accommodation per 42 U.S.C. Section 12181(7)(E) because it's an extension of Defendant's brick and mortar stores. The public is able to, among other things, view the products available at defendant's locations, purchase clothing through defendant's website, subscribe to Defendant's email list and receive a 15% discount on the first order over $100, create an account and register to track orders, and learn the story behind Defendant's brand, advertising campaigns, and models.

20) Since the Defendant's website is a public accommodation, it must comply with the requirements of the ADA. The website cannot discriminate against individuals with disabilities.

21) Plaintiff is a customer of Defendant who is and was interested in purchasing clothing through Defendant's website and at Defendant's stores and visiting Defendant's brick and mortar locations.

22) Plaintiff is not able to visit the physical locations without the assistance of a family member or caretaker, so the ability to purchase merchandise on Defendant's website for delivery to her home is important to her as an alternative when she is not able to visit the Defendant's stores.

23) The website also services Defendant's physical stores by providing information on its brand, sales campaigns, models, and other information that Defendant is interested in communicating to its customers about its physical locations.

24) Since the website allows the public the ability to view the products available at defendant's locations, purchase clothing through defendant's website, subscribe to Defendant's email list and receive a 15% discount on the first order over $100, create an account and register to track orders, and learn the story behind Defendant's brand, advertising campaigns, and models, the website is an extension of, and gateway to, Defendant's physical stores. By this nexus, the website is characterized as an intangible service, privilege and advantage provided by a place of public accommodation as defined under the ADA, and thus an extension of the services, privileges and advantages made available to the general public by Defendant through its retail brick and mortar stores.

25) Because the public can view and purchase Defendant's merchandise that is also offered for sale by Defendant at its physical stores, subscribe to Defendant's email list, create an account and register to track orders, and learn the story behind Defendant's brand, advertising campaigns, and models, the website is an extension of and gateway to the physical stores, which are places of public accommodation pursuant to 42 U.S.C. § 12181(7)(E). As such, the website, as an intangible service, privilege and advantage of Defendant's brick and mortar locations, must be fully accessible and in compliance with the ADA, must not discriminate against individuals with disabilities, and must not deny full and equal enjoyment of the same services, privileges and advantages afforded to the general public both online and at the physical locations.

26) At all times material hereto, Defendant was and still is an organization owning and operating the website located at https://goodamerican.com. Since the website is open through the internet to

the public as an extension of the retail stores, by this nexus the website is an intangible service, privilege and advantage of Defendant's brick and mortar locations, and Defendant has subjected itself and the associated website it created and maintains to the requirements of the ADA.

27) Plaintiff is and/or has been a customer who is interested in patronizing, and intends to patronize, Defendant's physical stores, and purchase Defendant's merchandise, sign up for Defendant's email list and account through the website and at Defendant's physical stores.

28) The opportunity to shop Defendant's merchandise from her home is an important accommodation for Plaintiff because traveling outside of the home as a visually disabled individual is often a difficult, hazardous, frustrating, confusing, and frightening experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually disabled individuals using screen reader software.

29) Like most consumers, Plaintiff accesses numerous websites at a time to compare merchandise and prices. Plaintiff may look at several dozens of sites to compare features and prices.

30) During the months of October and November 2019, Plaintiff attempted on several occasions to utilize the website to browse through the merchandise to educate herself as to the merchandise and with the intent to make a purchase through the website or at one of Defendant's physical stores.

31) Places of public accommodation are not just brick-and-mortar structures. The United States Department of Justice and the binding case law increasingly recognize that private entities are providing goods and services to the public through websites that operate as places of public accommodation under Title III.

32) Defendant is required to make reasonable accommodations to its websites for individuals with disabilities to allow them to participate in web-based promotions and obtain goods or services via the Internet just as sighted persons are able to do.

33) Plaintiff utilized Chrome Vox ("Screen Reader Software") to attempt to purchase clothing on Defendant's website. However, the Plaintiff was not able to freely and fully use Defendant's website because it contains access barriers that make it inaccessible to persons with disabilities, and for which there is no reasonable accommodation for the Plaintiff.

34) A person who can see can enjoy the benefits and privileges provided by Defendant's website that include, but are not limited to viewing the products available at defendant's locations, purchasing clothing through defendant's website, subscribing to Defendant's email list and receiving a 15% discount on the first order over $100, creating an account and registering to track orders, and learning the story behind Defendant's brand, advertising campaigns, and models.

35) A person who cannot see, like the Plaintiff in this case, cannot go to Defendant's website and avail themselves of the same privileges. Thus, the Plaintiff has suffered discrimination due to Defendant's failure to provide a reasonable accommodation for Plaintiff's disability.

36) The Department of Justice has provided useful guidance regarding website accessibility under the ADA, and the binding and persuasive case law in this district has applied the Web Content Accessibility Guidelines ("WCAG") 2.0 or 2.1 to determine accessibility.

37) Defendant's website does in fact fail the following WCAG 2.0-AA Compliance standards and it does not provide sufficient alternatives to serve the equivalent purpose:

   Violation: The purpose of each link cannot be determined from the link text alone or from the link text together with its programmatically determined link context.

> No purpose is provided in an audible format for the *Learn more* link associated with installment payments.

<u>Applicable WCAG 2.0 Standard at Issue</u>: *Standard 2.4.4 Link Purpose (In Context) (Level A)*.

<u>Nature of the Violation</u>: required by WCAG 2.0's *Standard 2.4.4 Link Purpose (In Context)*.

Violation: Labels or instructions are not provided when content requires user input.

Does not indicate in an audible format that desired size is not available.

<u>Applicable WCAG 2.0 Standard at Issue</u>: *Standard 3.3.2 Labels or Instructions (Level A)*.

<u>Nature of the Violation</u>: required by WCAG 2.0's *Standard 3.3.2 Labels or Instructions*.

Violation: When an input error is automatically detected, the item that is in error is not described to the user in text.

Does not indicate in an audible format existing error on Contact Information form when checking out.

<u>Applicable WCAG 2.0 Standard at Issue</u>: *Standard 3.3.1 Error Identification (Level A)*.

<u>Nature of the Violation</u>: required by WCAG 2.0's *Standard 3.3.1 Error Identification*.

Violation: When an input error that does not jeopardize the security or purpose of the content is automatically detected and suggestions for correction are known, these suggestions are not provided to the user.

Does not indicate in an audible format existing error on Contact Information form when checking out.

<u>Applicable WCAG 2.0 Standard at Issue</u>: *Standard 3.3.3 Error Suggestion (Level AA)*.

<u>Nature of the Violation</u>: required by WCAG 2.0's *Standard 3.3.3 Error Suggestion*.

38) Furthermore, Defendant's website does not contain accessibility assistance that would direct a visually impaired person like the Plaintiff to someone who she can contact for assistance, questions, or concerns.

39) Thus, Defendant has not provided full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations provided by and through the website, in contravention of the ADA.

40) On information and belief, Defendant is, and at all times has been, aware of the barriers to its website which prevent individuals with disabilities who are visually impaired from comprehending the information within same, and is also aware of the need to provide access to all persons who visit its site.

41) Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged in this Complaint, such that this suit for declaratory judgment and injunctive relief is her only means to secure adequate and complete redress from Defendant's discriminatory practices in connection with use of its website.

42) Notice to Defendant is not required because of Defendant's failure to cure the violations.

43) Enforcement of Plaintiff's rights under the ADA is right and just pursuant to 28 U.S.C. §§ 2201 and 2202.

44) Plaintiff has retained the undersigned attorneys to represent her in this case, and has agreed to pay them a reasonable fee for their services.

## COUNT I – VIOLATION OF THE ADA

45) Plaintiff realleges paragraphs 1 through 44 as if set forth fully herein.

46) Defendant owns and operates the https://www.goodamerican.com website, and is a public accommodation subject to the ADA pursuant to 42 U.S.C. §12181(7)(E).

47) Defendant's website is inaccessible to persons with disabilities like the Plaintiff, who is visually impaired. Plaintiff was not able to enjoy full and equal access to the information and services that Defendant has made available to the public on its website, in violation of 42 U.S.C. §12101. *et seq*, and as prohibited by 42 U.S.C. §12182 *et seq*.

48) Defendant's website is not in compliance with the ADA.

49) Defendant has made no reasonable accommodation for Plaintiff's disability.

50) A cursory review of a portion of the Defendant's website revealed that the website is not accessible to persons like the Plaintiff that are visually impaired as required by law and for which there is no sufficient alternative on Defendant's website, including:

> Violation: A mechanism is not available to bypass blocks of content that are repeated on multiple Web pages.
>
> No option is provided to skip navigation and access the page's content.
>
> Applicable WCAG 2.0 Standard at Issue: *Standard 2.4.1 Bypass Blocks (Level A).*
>
> Nature of the Violation: required by WCAG 2.0's *Standard 2.4.1 Bypass Blocks.*
>
> Violation: Not all functionality of the content is operable through a keyboard interface without requiring specific timings for individual keystrokes.

>Note/Proof: The *CHANGE MODEL* button cannot be triggered by the keyboard interface.
>
>Applicable WCAG 2.0 Standard at Issue: *Standard 2.1.1 Keyboard (Level A)*.
>
>Nature of the Violation: required by WCAG 2.0's *Standard 2.1.1 Keyboard.*

51) Due to Defendant's failure to provide an ADA compliant website, the Plaintiff has been injured since she has been denied full access to Defendant's website.

52) As a result, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303 to correct the inaccessibility that leads to discrimination against visually impaired persons.

WHEREFORE, Plaintiff requests entry of judgment in her favor and against Defendant for the following relief:

A. A declaration that Defendant's website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update its website, and continue to monitor and update its website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, the website and effectively communicate with the website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within its website, wherein the logo [1] would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the website;

D.      An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to insure compliance thereto.

E.      An Order directing Defendant, by a date certain to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to its website;

F.      An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for its website to insure effective communication for individuals who are visually disabled;

G.      An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's website to be fully accessible to the visually disabled;

H.      An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.      An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of its website to identify any instances where the website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review.

J.      An Order directing Defendant, by a date certain, to make publicly available and directly link from its website homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of its website and shall accompany the

public policy statement with an accessible means of submitting accessibility questions and problems.

K.      An award to Plaintiff of her reasonable attorney's fees, costs and expenses; and

Such other and further relief as the Court deems just and equitable.


[1]

## **COUNT II – TRESPASS**

53)   Plaintiff realleges paragraphs 1 through 44 as if set forth herein.

54)   Defendant's website contains software analytics.  Since Plaintiff has navigated Defendant's website as stated herein, Plaintiff's computer and the personal information and browsing history stored therein, has suffered a trespass by Defendant.

55)   Plaintiff never consented to and was unaware that Defendant's website was placing software on her computer.

56)    Defendant committed common law trespass in violation of Florida law against Plaintiff because Plaintiff did not consent to the placement of tracking and information securing software on her personal computer, which was done without her knowledge and consent.

57)   Defendant's trespass has damaged Plaintiff by affecting the condition and value of her computer.

58) On its website, Defendant has an internet privacy policy section that can only be accessed by clicking a barely visible section at the bottom right of the page called "Privacy Policy", providing that they use cookies and similar technologies to collect a consumer's information and they obtain non-public information from their users for their own advertising and marketing purposes by placing software on its website that collects a website user's preferences and internet browsing habits as follows:

*Information We Collect*

*If you reside in the United States or do not purchase goods through the Borderfree platform, there are two types of Information that may be collected through our Website: (1) "Personal Information" such as your name, e-mail address, physical address, phone number, credit card number, information about your computer and other information that may be used to directly identify you, and (2) "Usage Data" which is anonymous data about your use of the Website that is not linked to you personally.*

*You may enter the Website and browse its contents without submitting any Personal Information. However, if you wish to establish an account, make a purchase, contact us, subscribe to our newsletter or other mailings, post any comments, or otherwise communicate with us, we may at that time require that you provide Personal Information. When you submit Personal Information on the Website, you are giving your consent to the collection, use and disclosure of your Personal Information as set forth in this Privacy Policy.*

*If you choose to connect to our Website through a third-party social network such as Facebook (each, a "Social Network"), we may collect Personal Information from your profile on such Social Network, such as your name, username, and e-mail address, and we may publish your activity on our Website through such Social Network. In addition, our Website may offer social sharing features which will allow you to "Share" or "Like" on a Social Network. If you decide to use such features, it may allow the sharing and collection of Information both to and from such Social Network so you should check the privacy policy of each Social Network before using such features.*

*We may, from time to time, give you the ability to share our Website (or features or products thereon) with your friends. In order to do so, we may ask for certain Personal Information about your friends such as their name and e-mail address. It is solely your responsibility to ensure that your friend consents to receiving what you share from us. We will only use and store your friend's Personal Information for as long as necessary to fulfill your request. It will be deleted promptly after your request has been fulfilled.*

*Whether or not you submit Personal Information, we may collect, store or accumulate certain Usage Data based on your use of our Website, such as information regarding which of our pages or products are most popular, the browser you use, your computer's IP address, and the URLs you visited before and after using our Website.*

*Please note that we will only collect your credit card information if you choose to purchase our products online via our Website and do not use the Borderfree platform. If you do make such an online purchase, our payment processing partner will collect your payment information and process your payment. We do not store any credit card information or share it with anyone other than our payment processor.*

*Uses and Sharing of Information*

*We use your Personal Information that we collect directly to process your requests, fulfill your orders, authenticate website visits/usage, inform users of relevant products and specials through promotional e-mails, maintain and develop our Website, and communicate with you. You always will be given the opportunity to unsubscribe from further emails in any promotional messages we send you.*

*Except as described above, we will not disclose, rent, sell or share any Personal Information to unaffiliated third parties for marketing purposes.*

*We do contract with companies or individuals to provide certain services including email and hosting services, software development, credit card processing, shipping, data management, surveys and marketing, promotional services, etc. We call them our "Service Providers." Such Service Providers include Borderfree, which processes certain orders for residents outside the United States. We may share both your Personal Information and Usage Data with Service*

*Providers solely as appropriate for them to perform their functions. We do not share your credit card or other account information with third parties unless you authorize us to do so, or if it is necessary to fulfill our responsibilities including, but not limited to, delivering a product or service that you order.*

*Usage Data may be used in aggregate form for internal business purposes, such as generating statistics and developing marketing plans. We may share or transfer such aggregate, non-personally identifiable Usage Data with or to our affiliates, licensees and partners for administrative, analytical, research, optimization, security and other purposes, but no such information will be linked with your Personal Information or be used to identify or contact you.*

*Finally, we may share your Information: (i) In response to subpoenas, court orders, or other legal process; to establish or exercise our legal rights; to defend against legal claims; or as otherwise required by law. In such cases we reserve the right to raise or waive any legal objection or right available to us; (ii) When we believe it is appropriate to investigate, prevent, or take action regarding illegal or suspected illegal activities; to protect and defend the rights, property, or safety of our company, our users, or others; and in connection with our Terms of Use and other agreements; or (iii) In connection with a corporate transaction, such as a divestiture, merger, consolidation, or asset sale, or in the unlikely event of bankruptcy.*

***Privacy and Security***

*It is entirely your choice whether or not you provide Personal Information to us. We take commercially reasonable and appropriate technical and organizational precautions to protect our customers' Personal Information against loss, misuse, unauthorized disclosure, alteration, and destruction. However, please remember that no transmission of data over the Internet or any wireless network can be guaranteed to be 100% secure. As a result, while we strive to protect your Personal Information, we cannot ensure or warrant the security of any information that you transmit to us or from us, and you do so at your own risk. You hereby acknowledge that we are not responsible for any intercepted information sent via the Internet, and you hereby release us from any and all claims arising out of or related to the use of intercepted information in any unauthorized manner.*

*In addition, while we take commercially reasonable steps to govern our Service Providers' use and protection of your Personal Information, we ultimately have no control over and are not responsible for the privacy practices of such parties. As a condition to your use of the Website, you expressly agree we bear no responsibility, and are not liable in any way, for the acts, omissions or policies of our Service Providers or any other external sources with respect to your Information. If you believe your Personal Information is being improperly used by us or any third party, please immediately notify us via email at [dataprivacy@goodamerican.com](mailto:dataprivacy@goodamerican.com).*

*Cookies*

*In order to improve your user experience, we may use cookies, web beacons or similar tracking technologies. These "Cookies" are small pieces of information that are stored by your browser on your computer's hard drive. Generally, Cookies work by assigning to your computer a unique number that has no meaning outside of the Website. Our Cookies do not generally contain any personally identifying information. Most web browsers automatically accept Cookies, but you can usually configure your browser to prevent this. However, not accepting Cookies may make certain features of the Website unavailable to you. Consenting to our use of cookies in accordance with the terms of this policy when you first visit our website permits us to use cookies every time you visit our website.*

59) Due to Plaintiff's disability, she could not understand Defendant's website and she could not give informed consent to Defendant's installation of data and information tracking software on her computer. Defendant also could not give informed consent to Defendant's collection of her browsing history and the placement of analytics on her computer.

60) Thus, Plaintiff has no adequate remedy at law to redress Defendant's knowing and reckless disregard for Plaintiff's right to exclude others from her computer and determine which programs should be installed and operated on her computer.

WHEREFORE, Plaintiff demands judgment against Defendant for Plaintiff's damages, interest, costs, and such further relief as the Court deems just and equitable.

### Request for Jury Trial

61) Plaintiff requests a jury trial.

Submitted by:

Mendez Law Offices, PLLC
Attorneys for Plaintiff
P.O. BOX 228630
Miami, Florida 33172
Telephone: 305.264.9090
Facsimile: 1-305.809.8474
Email: info@mendezlawoffices.com
By: _____/s/_____
DIEGO GERMAN MENDEZ, ESQ.
FL BAR NO.: 52748

Adams & Associates, P.A.
Attorneys for Plaintiff
6500 Cowpen Road, Suite 101
Miami Lakes, FL  33014
Telephone:  305-824-9800
Facsimile:  305-824-3868
Email:  lr1208@live.com
By: _____/s/_____
LYDIA C. QUESADA, ESQ., of Counsel
FL BAR NO.: 191647